# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP3007-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |    Plaintiff-Respondent, |
| |  v. |
| | Derik J. Wantland, |
| |    Defendant-Appellant-Petitioner. |

---

REVIEW OF A DECISION OF THE COURT OF APPEALS
346 Wis. 2d 680, 828 N.W.2d 885
(Ct. App. 2013 – Published)
PDC No: 2013 WI App 36

---

| | |
|---|---|
| OPINION FILED: | July 11, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 20, 2014 |

---

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | Circuit |
|  COUNTY: | Sheboygan |
|  JUDGE: | Timothy Van Akkeren |

---

| | |
|---|---|
| JUSTICES: | |
|  CONCURRED: | |
|  DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| | PROSSER, J., ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
|  NOT PARTICIPATING: | |

---

ATTORNEYS:

For the defendant-appellant-petitioner, the cause was argued by *Tristan S. Breedlove*, assistant state public defender, with whom on the briefs was *Susan E. Alesia*, assistant state public defender.


For the plaintiff-respondent, the cause was argued by *Sarah K. Larson*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

No.  2011AP3007-CR
(L.C. No.  2011CF56)

STATE OF WISCONSIN              :      IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Derik J. Wantland,**

    **Defendant-Appellant-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification.  The final version will appear in the bound volume of the official reports.**

**FILED**

**JUL 11, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Affirmed*.

¶1  ANNETTE KINGSLAND ZIEGLER, J.   This is a review of a decision of the court of appeals, State v. Wantland, 2013 WI App 36, 346 Wis. 2d 680, 828 N.W.2d 885, that affirmed the judgment and order of the Sheboygan County Circuit Court,[1] which convicted Derik J. Wantland ("Wantland") of possession of a narcotic and denied his motion to suppress evidence.

¶2  Both the State and Wantland concede that the driver consented to the search of the vehicle in which the briefcase was located, and concede that the driver's consent was not

---

[1] The Honorable Timothy M. Van Akkeren presided.

limited in a way that would have excluded the briefcase from the search.[2] Wantland's petition for review and argument assume that the driver's general consent to search was not limited until Wantland, the passenger, asked the officer whether he had a warrant for the briefcase. Thus, this opinion addresses not whether the officer had the driver's general consent in the first instance, but rather, we address whether Wantland's question limited that consent.[3]

¶3 Wantland argues that the warrantless search of his briefcase, which led to the discovery of the narcotics, was unreasonable and therefore violated his rights under the Fourth

---

[2] Indeed, Wantland's petition for review framed the issue as whether "[w]hen the passenger asks 'got a warrant for that?' before the officer opens a briefcase found in the hatchback of the car, has the driver's general consent to search the car been limited?" This statement of the issue clearly assumes that the driver's initial consent to search was valid and extended to the briefcase. Wantland framed his argument almost identically in his brief, arguing that his question "effectively limited the driver's general consent to search the car." The State noted the concession, stating "[t]his case is not about the validity of the original consent to search the entire vehicle . . . [a]s Wantland concedes . . . the valid, unambiguous, unlimited, general consent to search the vehicle was given by someone with authority to consent——the brother." Wantland did not object to this characterization of his position in his reply brief or at oral argument.

[3] Chief Justice Abrahamson's dissent chooses to address an issue that is not relevant to why we accepted the petition for review. In fact, the issue of whether the driver's initial consent to search was valid is the subject of long settled law, see State v. Matejka, 2001 WI 5, ¶19, 241 Wis. 2d 52, 621 N.W.2d 891, and therefore would constitute mere error correction inappropriate for our review. See Wis. Stat. § 809.62(1r)(a) (2013-14).

2

Amendment. Wantland contends that he asserted ownership of the briefcase and withdrew the driver's consent by asking "Got a warrant for that?" of the police officer who was conducting the search. He further argues that the police officer had a duty to ask follow-up questions to clarify any ambiguity once Wantland asked his question.

¶4 The State argues that Wantland's question "Got a warrant for that? was too ambiguous to constitute a withdrawal of the driver's consent. The State further contends that the officer was under no duty to clarify Wantland's question.

¶5 We conclude that Wantland did not effectively withdraw the driver's consent when he asked "Got a warrant for that?" Further, we conclude that police officers confronted with ambiguous statements, such as Wantland's, are not under a duty to ask follow-up questions to clarify the ambiguity. As a result, we conclude that the search of the briefcase was reasonable under the circumstances, and we affirm the decision of the court of appeals.

## I. FACTUAL BACKGROUND

¶6 On August 26, 2010, Sheboygan County Sheriff's Deputy Jason Brockway ("Deputy Brockway") stopped a vehicle in Random Lake, Wisconsin, for driving with a cracked windshield and a defective brake light. The vehicle was being driven by

Wantland's brother, Dennis Wantland ("the driver").[4]  Wantland was riding in the front passenger seat of the vehicle.

¶7  After issuing a written warning, Deputy Brockway asked the driver to step out of the car so that he could show him the brake light and explain why driving with a cracked windshield was dangerous.  Deputy Brockway then informed the driver that he was free to leave.  After walking back to his squad car, Deputy Brockway turned and asked the driver if there was "anything in the vehicle that wasn't supposed to be in the vehicle."[5]  When the driver responded that he did not believe there was, Deputy Brockway asked if he could search the car.[6]  The driver responded "Um, I don't see why not. We gotta get our tools and stuff out anyway."  Deputy Brockway then asked both men to step out of the vehicle and wait by the curb while he performed the search.

---

[4] During the course of the search, Dennis Wantland informed Deputy Brockway that the vehicle was actually registered to his sister-in-law.

[5] An officer making this this type of statement is seeking general consent to search, rather than requesting permission to search for a certain item or items.  United States v. Canipe, 569 F.3d 597, 605 (6th Cir. 2009).

[6] The police procedure whereby "a police officer attempts to obtain a person's consent to a search even though the officer has no legal basis to further detain the person" has been deemed acceptable.  State v. Kolk, 2006 WI App 261, ¶23 n.7, 298 Wis. 2d 99, 726 N.W.2d 337.  This court has held that, so long as "a reasonable person would have felt free to decline the officer's questions and leave the scene, or otherwise terminate the encounter," such consent is a valid exception to the warrant requirement.  State v. Williams, 2002 WI 94, ¶35, 255 Wis. 2d 1, 646 N.W.2d 834; see also State v. Jones, 2005 WI App 26, ¶¶9-10, 278 Wis. 2d 774, 693 N.W.2d 104.

4

¶8 During Deputy Brockway's search of the passenger compartment of the vehicle, he noted some razor blades and asked what they were for. The driver replied, "we got these little, um, utility knives that we use they're for-- painting the windows and stuff, [it's] easier to just paint over the trim then come back."

¶9 After searching the passenger compartment, Deputy Brockway opened the back hatch of the vehicle and observed a variety of tools and toolboxes, along with a briefcase. Deputy Brockway asked what was in the briefcase. Wantland responded, "A laptop. Uh. Got a warrant for that?" Deputy Brockway responded, "I can open up the, uh, laptop" and proceeded to remove the briefcase from the vehicle. Wantland then recounted the contents of the briefcase, stating "Yeah, it's uh, laptop, Visine, acid reflux."

¶10 During his search of the briefcase, Deputy Brockway discovered pills that appeared to be inconsistent with the bottle in which they were found.[7] A second officer, called in by Deputy Brockway for his expertise in identifying narcotics, verified that the pills were morphine. The briefcase also contained letters and personal papers with Wantland's name on them. At that point, Deputy Brockway arrested Wantland and informed him of his <u>Miranda</u> rights. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). A search incident to Wantland's arrest

---

[7] The label indicated that the pill bottle should contain 40mg antacid pills, but the pills Deputy Brockway discovered were marked "30mg."

5

revealed two additional morphine pills concealed in some loose tobacco in Wantland's pocket.

## II.    PROCEDURAL POSTURE

¶11  On January 27, 2011, the State filed a complaint charging Wantland with possession of narcotic drugs without a prescription, as a repeater, contrary to Wis. Stat. §§ 961.41(3g)(am) and 939.62(1)(b) (2011-12).[8]  On February 14, 2011, Wantland made his initial appearance, waived a reading of the complaint, and requested a preliminary hearing.  The court set Wantland's signature bond at $5,000.  On February 23, 2011, the court held a preliminary hearing, found probable cause to bind Wantland over for trial, and the State filed an information which alleged the same charge against Wantland.  On March 25, 2011, Wantland was arraigned on the information and pled not guilty.

¶12  On April 5, 2011, Wantland filed a motion to suppress the evidence uncovered during Deputy Brockway's search of the briefcase.[9]  On April 12, 2011, the circuit court held a hearing

---

[8] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[9] Wantland also filed motions to suppress the fruits of his detention and to suppress any statements he made following his arrest.  Wantland admitted before the circuit court that these additional motions were "all connected to the search of the vehicle."  Because we conclude that the search in this case was reasonable, and because Wantland did not raise these issues in his petition for review, we need not address these arguments.

on Wantland's motion.[10] At the hearing, Wantland argued that there was no valid consent to search the vehicle because the circumstances of the stop were coercive. Alternatively, Wantland argued that his question "Got a warrant for that?" was sufficient to withdraw any consent that may have been given. The State argued that the driver's consent to search the vehicle was valid and was not limited in any way, and that Wantland's question was not sufficient to withdraw the original consent.

¶13 On May 2, 2011, the circuit court denied Wantland's motion to suppress. The court concluded that the initial consent was voluntary and was not the result of any coercion or show of force on the part of Deputy Brockway. The court further concluded Wantland's question did not withdraw the driver's original consent.

¶14 On May 3, 2011, Wantland pled no contest to the charge pursuant to a plea agreement. In exchange for his plea, the State agreed to recommend 18 months probation. The circuit court accepted Wantland's plea, found him guilty, and accepted the State's recommendation with regard to sentencing.

¶15 On December 21, 2011, Wantland appealed. Before the court of appeals, Wantland narrowed the issue and argued that the circuit court erred in denying his motion to suppress because his question "Got a warrant for that?" effectively

---

[10] Due to scheduling conflicts, the motion hearing had to be continued twice. Additional testimony was taken on April 20, 2011, and counsel presented brief arguments before the court's ruling on May 2, 2011.

withdrew the general consent his brother had given Deputy Brockway.  The State again contended that, as the driver of the vehicle, the driver had apparent authority to consent to a search, and that Wantland's subsequent question did not withdraw that consent.

¶16  On February 20, 2013, the court of appeals affirmed the circuit court.  Wantland, 346 Wis. 2d 680, ¶1.  The court of appeals determined that, under the totality of the circumstances, a reasonable person would not have understood Wantland's question to be a withdrawal of his brother's general consent to search the vehicle.  Id., ¶¶8-9.  As a result, the court of appeals concluded that the search was legal and upheld the circuit court's denial of Wantland's motion to suppress. Id., ¶12.

¶17  On March 22, 2013, Wantland petitioned this court for review, which we granted on November 21, 2013.

### III. STANDARD OF REVIEW

¶18  "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact."  State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463 (citing State v. Hughes, 2000 WI 24, ¶15, 233 Wis. 2d 280, 607 N.W.2d 621).

¶19  "When presented with a question of constitutional fact, this court engages in a two-step inquiry."  Id. (citations omitted); see also State v. Popke, 2009 WI 37, ¶10, 317 Wis. 2d 118, 765 N.W.2d 569.  "First, we review the circuit court's findings of historical fact under a deferential

8

standard, upholding them unless they are clearly erroneous. Second, we independently apply constitutional principles to those facts." Id. (citations omitted).[11]

## IV. ANALYSIS

¶20 "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Illinois v. Rodriguez, 497 U.S. 177 (1990)). The United States Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Id. at 250-51 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). Thus, "a search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth, 412 U.S. at 222; see also Wis. Stat. § 968.10(2).

¶21 "The scope of a search is generally defined by its expressed object." Jimeno, 500 U.S. at 251 (citing United States v. Ross, 456 U.S. 798 (1982)). "One who consents to a search 'may of course delimit as he chooses the scope of the search to which he consents.'" State v. Matejka, 2001 WI 5, ¶37, 241 Wis. 2d 52, 621 N.W.2d 891 (quoting Jimeno, 500 U.S. at 252). "But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides

---

[11] In the case at issue the historical facts are undisputed. Therefore, this opinion focuses on the second step of the analysis: applying the undisputed facts to the constitutional standard.

9

no grounds for requiring a more explicit authorization." Jimeno, 500 U.S. at 252.

¶22 Further, "[t]he Supreme Court long ago held that officers may conduct warrantless searches based upon a third-party's consent, where the third party has common authority over the premises to be searched." Matejka, 241 Wis. 2d 52, ¶19 (citing United States v. Matlock, 415 U.S. 164, 169-71 (1974)).

¶23 Before consent may operate as a valid exception to the warrant requirement, two conditions must be met. First, the consent must have been "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Second, the consent must be given by an individual having either actual or apparent authority over the place to be searched. See Rodriguez, 497 U.S. at 181 (citing Matlock, 415 U.S. at 171).

¶24 In the case at issue, the parties agree that the driver voluntarily consented to a search of the vehicle. It is thus undisputed that the consent was neither mere acquiescence to a claim of lawful authority nor obtained through coercion. See, e.g., United States v. Mendenhall, 446 U.S. 544, 558 (1980); State v. Johnson, 2007 WI 32, ¶17, 299 Wis. 2d 675, 729 N.W.2d 182. The parties also agree that the driver had actual authority over the vehicle, and thus his consent to search the vehicle was valid. Schneckloth, 412 U.S. at 222. Further, Wantland concedes that the driver did not limit the scope of the initial consent. In other words, he concedes that a reasonable person would have understood the initial consent given by the

10

driver to extend to all containers within the vehicle, including the briefcase.

¶25 In sum, Wantland and the State agree that, absent Wantland's question, Deputy Brockway's search of the briefcase would have been constitutionally permissible. Thus, the focus of our attention rests upon whether Wantland's question "Got a warrant for that?" effectively withdrew the driver's consent.

¶26 Wantland argues that once he asked his question "Got a warrant for that?" the officer's search of his briefcase was unreasonable. Wantland contends that his question undermined the driver's apparent authority and constituted a withdrawal of the driver's original consent to search the briefcase. Alternatively, Wantland argues that Deputy Brockway had a duty to ask follow-up questions to resolve any ambiguity. We reject these arguments and affirm the court of appeals.

A. Wantland Did Not Withdraw Consent

¶27 Third-party consent to a search may be valid, so long as "'permission to search was obtained from a third party <u>who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected</u>.'" Matejka, 241 Wis. 2d 52, ¶32 (emphasis in Matejka) (quoting Matlock, 415 U.S. at 171). In the context of an automobile, this court has held that the common authority inquiry "focuses not necessarily on the third-party's authority over the specific object in question, but the third-party's authority over the premises in which that object is located." Id., ¶36.

11

¶28 The driver of a vehicle has "obvious possessory authority over the vehicle and therefore the capacity to consent to its search." Id., ¶35. Further, "by virtue of the joint access and mutual use of the interior" of the vehicle, the driver has apparent authority to consent to a search of the belongings of any passengers in the vehicle. Id. This accords with the general proposition that "consent to search a space includes consent to search containers within that space where a reasonable officer would construe the consent to extend to the container." United States v. Melgar, 227 F.3d 1038, 1041 (7th Cir. 2000) (citing Jimeno, 500 U.S. at 251).

¶29 In the case at issue, it is undisputed that Deputy Brockway obtained consent to search for "anything in the vehicle that wasn't supposed to be in the vehicle." A reasonable officer would construe this as a general consent that extends to containers. See, e.g., United States v. Canipe, 569 F.3d 597, 600 (6th Cir. 2009) (determining that a request to look for "'anything' in [a] vehicle that might be unlawful or about which [the officer] needed to know" was a request for general consent to search); United States v. Crain, 33 F.3d 480, 483-84 (5th Cir. 1994) (determining that a request to "look inside" a vehicle, without any further explanation, was a request for general consent to search). "It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers."

12

Canipe, 569 F.3d at 605 (quoting United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995)); see also Crain, 33 F.3d at 484.

¶30 The driver gave Deputy Brockway valid consent to search containers in the vehicle, and the driver had apparent authority over those containers at the time consent was given.[12]

¶31 Wantland argues, however, that his question "Got a warrant for that?" undermined the driver's apparent authority over the briefcase, and should have led Deputy Brockway to conclude that he had withdrawn the driver's consent to its search.

¶32 Wantland points to a number of cases where the apparent authority of a driver did not extend to items in the vehicle that belonged to passengers. See United States v. Munoz, 590 F.3d 916, 922-23 (8th Cir. 2010); United States v. Welch, 4 F.3d 761, 765 (9th Cir. 1993) modified, United States v. Kim, 105 F.3d 1579, 1580-81 (9th Cir. 1997); State v. Suazo, 627 A.2d 1074 (N.J. 1993); State v. Williams, 616 P.2d 1178 (Or. Ct. App. 1980). Munoz, Welch, and Williams, however, address whether initial consent was valid, not whether consent was later withdrawn. These cases do not support Wantland's claim that the officer, who had consent to search, should have known that Wantland's later question, "Got a warrant for that?" was a sufficiently clear assertion of ownership so to inform Deputy

---

[12] The parties do not dispute that the briefcase was not locked or otherwise secured. As we noted in State v. Matejka, another fact scenario "might give rise to a different focus for the common authority analysis." 241 Wis. 2d 52, ¶36.

13

Brockway that the consent to search the briefcase was withdrawn.[13] In addition, Suazo is factually distinct from the case at issue because in that case the passenger unequivocally stated that the item at issue belonged to him and not the driver.[14] In fact, mere assertion of ownership of an item may be insufficient to constitute withdrawal of consent. See, e.g., United States v. West, 321 F.3d 649, 652 (7th Cir. 2003) (holding that the lawfulness of the search turned not on whether the defendant owned the item searched, but rather turned on whether he withdrew consent). Because Wantland concedes that the initial consent was valid, the issue before this court turns on whether Wantland's question "Got a warrant for that?" served to unequivocally withdraw that consent.

---

[13] For example, in United States v. Welch officers obtained consent from a male suspect to search a rental vehicle he shared with a female suspect but did not obtain consent to search the female suspect's purse. 4 F.3d 761, 762 (9th Cir. 1993). On appeal, the Ninth Circuit concluded that, while the suspect had authority to consent to the search of the car, "there is simply nothing in the record demonstrating that [the male suspect] had use of, let alone joint access to or shared control over, [the defendant's] purse." Id. at 764. By contrast, in the case at issue, Deputy Brockway's belief that the briefcase was at least subject to joint access or shared control is amply supported by the record.

[14] The driver of the vehicle in State v. Suazo consented to the initial search, but when the non-consenting passenger's bag was removed from the trunk, the passenger clearly stated that it belonged to him and not the driver. 627 A.2d 1074, 1075. Such a clear statement of ownership is lacking in the case at issue. A reasonable person would not understand the statement "Got a warrant for that?" to mean "that belongs to me."

¶33 "'Withdrawal of consent need not be effectuated through particular "magic words," but an intent to withdraw consent must be made by unequivocal act or statement.'" United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005) (quoting United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004)); see also United States v. Alfaro, 935 F.2d 64, 67 (5th Cir. 1991); Payton v. Commonwealth, 327 S.W.3d 468, 478 (Ky. 2010). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness——what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251 (citing Rodriguez, 497 U.S. at 183-89; Florida v. Royer, 460 U.S. 491, 501-02 (1983)).

¶34 Unequivocal acts or statements sufficient to constitute withdrawal of consent may include slamming shut the trunk of a car during a search, see United States v. Flores, 48 F.3d 467, 468 (10th Cir. 1995), grabbing back the item to be searched from the officer, see United States v. Ho, 94 F.3d 932, 934 (5th Cir. 1996), and shouting "No wait" before a search could be completed, see United States v. Fuentes, 105 F.3d 487, 489 (9th Cir. 1997).

¶35 By contrast, Wantland's inquiry "Got a warrant for that?" was equivocal, such that it did not clearly withdraw the otherwise valid consent of his brother, the driver. Wantland did not ask the officer to stop the search as the vehicle owner did in Fuentes. He did not take action to prevent the officer from accessing the briefcase, as the item's owners did in Flores

15

and Ho.  Rather, Wantland did little to indicate that he owned the briefcase and that the officer was not free to search the briefcase.  In fact, case law does not support the notion that Wantland's question, "Got a warrant for that?" was sufficient to constitute a withdrawal of consent.

¶36 Payton v. Commonwealth illustrates why Wantland's question did not constitute a withdrawal of consent.  In Payton police officers received valid consent to search a residence from the suspect's wife.  327 S.W.3d at 470.  When officers entered the bedroom in which the defendant was sitting, Payton immediately asked, "where's your warrant?"  Id. at 476.  When the officers informed the defendant that his wife had consented to the search, he responded, "'Fine' or 'Well, okay.'"  Id. at 470.  The officers subsequently discovered methamphetamine hidden in the bedroom.  Id. at 471.

¶37 At trial Payton sought to suppress the methamphetamine, arguing that when he asked "where's your warrant?" he withdrew his wife's consent to search the house. Id.  The court denied his motion and the defendant appealed. Id.

¶38 The Supreme Court of Kentucky affirmed the trial court's denial of the motion to suppress.  Id. at 470.  The Kentucky Supreme Court concluded that the defendant "cannot be said to have 'unequivocally refused' consent by his asking 'where's your warrant' and then saying 'fine' or 'well, okay' after being told his wife had already consented to a search." Id. at 478.  The court distinguished the facts before it from

16

other cases in which a defendant "unequivocally refuse[s]" to consent to a search. Id. (citing Georgia v. Randolph, 547 U.S. 103, 107 (2006)).

¶39 Notably, Wantland's warrant question was almost identical to the question asked by the suspect in Payton. Also similar to the conversation in Payton, Wantland's question was immediately followed by statements that were conversational rather than an unequivocal indication that the officer should cease the search. Instead of denying access to the briefcase, Wantland explained what the officer would find inside the briefcase. Additionally, unlike the defendant in Payton, who responded as soon as he became aware of the consent to search, Wantland was present at the time the original consent was given and did not object to that consent. Instead, Wantland stayed quiet throughout the search of the passenger compartment of the vehicle and did not ask any question or make any comment until Deputy Brockway reached for the briefcase. Even then it was far from clear that Wantland was telling the officer that he could no longer search the briefcase. Given these facts, under the totality of the circumstances, a reasonable person would not understand Wantland's question to be an unequivocal withdrawal of an otherwise valid consent to search the briefcase.

¶40 Similarly, in United States v. Gray, the Eighth Circuit concluded that a defendant's expression of frustration with the length of time the search was taking and a stated desire to leave was not sufficient to constitute a withdrawal of his previous consent to search. 369 F.3d at 1026. The court

17

held that that "intent to withdraw consent must be made by unequivocal act or statement." Gray's statement that the length of the search was "ridiculous" and that he and his companion were "ready to go now" "amounted to an expression of impatience, which is not sufficient to terminate consent." Id. (citing United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001)). Wantland's remarks were even more equivocal than those made by Gray, in that Gray at least referenced a desire to depart the scene.

¶41 Similar ambiguous statements were deemed insufficient to constitute a withdrawal of a previous consent to search in United States v. Gregoire, 425 F.3d 872, 881 (10th Cir. 2005). In Gregoire the driver had consented to a search of his vehicle but later stated, "I [was] planning to be home" and "[i]sn't that illegal" as the search progressed. Id. The Tenth Circuit concluded that these statements were too ambiguous to constitute withdrawal of the driver's original consent to search. Id. Unlike Gregoire Wantland did not imply that he wanted to leave, and he did not clearly indicate that he believed the search was illegal.

¶42 Under the analysis of these cases, Wantland's question "Got a warrant for that?" must be deemed ambiguous. Such a question may constitute an inquiry regarding the officer's lawful authority to search the briefcase, but it is far from an unequivocal withdrawal of consent. Deputy Brockway's response, "I can, uh, open the laptop," was responsive to Wantland as Deputy Brockway already had legal authority for the search from

18

the driver. Moreover, Wantland's listing out the contents of the briefcase failed to clearly indicate that Deputy Brockway no longer had consent to search the briefcase.

¶43 Further, the driver initially made numerous statements to Deputy Brockway clarifying which items in the vehicle belonged to the occupants jointly. For example, the driver stated, "We gotta get our tools and stuff out anyway" in responding to the initial request for consent. (Emphasis added). Further, in response to a question from Deputy Brockway about the razor blades in the vehicle, the driver replied, "we got these little, um, utility knives that we use." (Emphasis added). Wantland said nothing to indicate that other items may belong to him alone. Thus, to the extent that a reasonable officer would conclude that some of the items in the vehicle did not belong solely to the driver, that indication related, at most, to the tools and knives and not the briefcase.[15] Notably, Wantland never made any statement to the effect that the briefcase was not to be searched. In fact, prior to asking "Got a warrant for that?" Wantland had said nothing at all about the briefcase or any other item in the vehicle. Nothing in the plain question "Got a warrant for that?" would have

---

[15] We are not confronted with whether the officer's search of the tools or knives was inappropriate. Thus, we need not address whether the driver's consent was somehow limited with respect to these items. In addition, we do not conclude that an officer has a duty to put items such as these, which are potential weapons, into the hands of the requester, especially while the officer is conducting a search and such items could be used to harm the officer.

19

unequivocally indicated to a reasonable person that consent to search the briefcase had been withdrawn.

¶44 Hence, a reasonable person considering the totality of the circumstances would not understand Wantland's inquiry to be an unequivocal withdrawal of consent. See Jimeno, 500 U.S. at 251; Sanders, 424 F.3d at 774. Thus, Deputy Brockway's search of the briefcase was reasonable.

### B. Officer's Duty To Inquire

¶45 Finally, Wantland argues that where ownership or authority over a closed container is unclear, police officers are under a duty to make further inquiry to resolve the ambiguity before proceeding with a search. We conclude that law enforcement is not under such a duty to further inquire.

¶46 The Seventh Circuit has held that once police have received consent to search the premises from a person with apparent authority, they may rely on that authority to search closed containers without further inquiry, unless they encounter an item which they "have reliable information . . . is not under the authorizer's control." United States v. Melgar, 227 F.3d 1038, 1041 (7th Cir. 2000) (emphasis in original). The court noted that "[a] contrary rule would impose an impossible burden on the police." Id. at 1042.

¶47 We agree. Once valid consent for a search has been secured, law enforcement officers are not required to halt their search and question whether consent is still valid every time a person makes an ambiguous statement regarding the ownership of

20

an item that is otherwise within the scope of that consent.[16] See Frazier v. Cupp, 394 U.S. 731, 740 (1969) (holding that the court would not engage in "metaphysical subtleties" in determining the efficacy of a third party's consent). Such a rule would place an onerous and unreasonable burden on law enforcement, particularly given that the true owner of the property may or may not be present. See, e.g., Matlock, 415 U.S. at 166-67. Thus, an officer need not clarify whether an ambiguous statement is meant to withdraw otherwise valid consent to search. Melgar, 227 F.3d at 1041; see also Matejka, 241 Wis. 2d 52, ¶32 (quoting Matlock, 415 U.S. at 171).

## V. CONCLUSION

¶48 We conclude that Wantland did not effectively withdraw the driver's consent when he asked, "Got a warrant for that?" Further, we conclude that police officers confronted with ambiguous statements, such as Wantland's, are not under a duty to ask follow-up questions to clarify the ambiguity. As a result, we conclude that the search of the briefcase was reasonable under the circumstances, and we affirm the decision of the court of appeals.

---

[16] In fact, this court has declined the opportunity to require law enforcement to inquire further in other settings. See, e.g., State v. Edler, 2013 WI 73, ¶¶86-87, 350 Wis. 2d 1, 833 N.W.2d 564 (Ziegler, J., concurring in part, dissenting in part); State v. Jennings, 2002 WI 44, ¶¶31-36, 252 Wis. 2d 228, 647 N.W.2d 142 (indicating that while clarifying questions are "good police practice," such questions are not required).

*By the Court.*—The decision of the court of appeals is affirmed.

¶49 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* The majority opinion repeatedly proclaims that the driver of the car (the defendant's brother) validly consented to the law enforcement officer's search of the motor vehicle and all containers in the vehicle, including the defendant's briefcase.[1]

¶49 The majority opinion maintains that the instant case is not one addressing "whether initial consent was valid." Majority op., ¶32. Rather, the majority opinion addresses whether the defendant effectively revoked the driver's valid consent to search the briefcase.[2]

¶50 The State, the defendant, Justice Prosser, and I disagree with the majority opinion's view of the issue presented. I join Justice Prosser's dissent.

¶51 We understand the issue to be whether the driver's consent to the search of the vehicle, including a consent to search the containers and briefcase therein, was valid after it became clear to law enforcement that the driver did not own the briefcase. The driver's initial consent to search the vehicle may have appeared as valid consent to search any container or briefcase in the vehicle. But the issue in the instant case is whether facts coming to light during the search should have caused a reasonable person to doubt the validity of the consent to a search of the briefcase, that is, should have caused a

---

[1] Majority op., ¶¶24, 30, 33, 35-36, 39, 47.

[2] <u>See</u> majority op., ¶25.

1

reasonable person to have doubted the authority of the driver to consent to a search of the briefcase.[3]

¶52 The warrant requirement of the United States and Wisconsin Constitutions does not apply when a party consents to a search,[4] when a third party with common control over the searched premises consents,[5] or when an individual with apparent authority to consent does so.[6]

¶53 "When police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent. . . . But, the question is not to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer. . . . [T]he standard is 'that of "objective" reasonableness . . . .'"[7]

¶54 Although the driver in the present case appeared to have the authority to consent to a search of the vehicle and its contents, the defendant's claim of ownership of the briefcase put the officer on notice that someone other than the driver might have authority over the briefcase. When circumstances suggest that the property to be searched belongs to someone

---

[3] See 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.3(g), at 245 (5th ed. 2012).

[4] Schneckloth v. Bustamonte, 412 U.S. 218 (1973).

[5] Florida v. Jimeno, 500 U.S. 248 (1991).

[6] Illinois v. Rodriguez, 497 U.S. 177 (1990).

[7] 4 LaFave, supra note 3, § 8.1(c), at 22-23 (quoted source omitted, emphasis in original).

2

other than the consenting person, the validity of the consenting person's consent becomes questionable, even if the consent was voluntarily given.

¶55 As the State's brief correctly explains, "it is the sufficiency of the consenting individual's relationship to the premises to be searched[ ] that the State must establish."[8] The test is whether a reasonable officer would believe under the totality of the circumstances that the consenter had authority to consent to the search:

> The crux of this case is what a reasonable [law enforcement officer] would believe, under the totality of the circumstances, about who had apparent authority over the briefcase at the time [the defendant] made his warrant remark. Consent (and by extension, revocation or limitation of that consent) requires authority to consent in the first instance.[9]

¶56 The State has the burden in the present case to prove by clear and convincing evidence that a reasonable law enforcement officer would believe, under the totality of the circumstances, that the driver had authority to consent to the search of the briefcase.[10]

¶57 I address three issues:

---

[8] State v. Kieffer, 217 Wis. 2d 531, 542, 577 N.W.2d 352 (1998).

[9] Brief of the Plaintiff-Respondent at 5 (second emphasis added). See also Justice Prosser's dissent, ¶114 ("The question is whether his consent to search the vehicle not only covered a closed container within the vehicle, but also remained valid after his non-ownership of the closed container became clear . . . .").

[10] Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

3

- First, whether a reasonable law enforcement officer would believe, under the totality of the circumstances, that the driver had authority to consent to the search of the briefcase;

- Second, whether the law enforcement officer's erroneous assertion of authority to search the laptop in the briefcase undermined the defendant's authority to withdraw or limit the driver's consent;

- Third, what the standard is for determining whether a person withdraws, limits, or revokes consent.

¶58 I conclude that the State did not meet its burden to prove that a reasonable law enforcement officer would believe, under the totality of the circumstances of the instant case, that the driver had authority to consent to the search of the briefcase. Accordingly, I dissent.

I

¶59 The validity of the driver's consent to the law enforcement officer's search of the briefcase turns on whether the driver had apparent authority to consent to the search of the briefcase, as I have previously stated. Neither party claims that the driver had actual authority to consent to the search of the briefcase.

¶60 I conclude that under the totality of the circumstances in the present case, a law enforcement officer could not reasonably believe that the driver had apparent authority to consent to a search of the briefcase. Gauging the

4

objective reasonableness of a law enforcement officer's actions is a particularly fact-sensitive inquiry.[11]

¶61 The majority opinion limits its inquiry to the statement, "Got a warrant for that?" but the totality of the circumstances is more than this statement

¶62 The defendant asserted his claim of ownership over the briefcase as follows:

DEPUTY: What's in the briefcase?

DEFENDANT: A laptop. Uh, got a warrant for that?

[At this point, the deputy has unlatched and begun opening the briefcase.]

DEPUTY: I can open up the, uh, laptop.

DEFENDANT: Yeah, it's a laptop, Visine, acid reflux . . . .

¶63 The facts available to the officer at the time of the search of the briefcase include the following:

- The consenting driver did not own the vehicle;

- The consenting driver advised the officer that some property in the vehicle (such as tools) belonged to the defendant;

- When the officer asked what was in the briefcase, the defendant answered, not the driver;

- When the officer asked what was in the briefcase, the defendant correctly identified the contents, while the driver was silent about the contents of the briefcase;

---

[11] See Missouri v. McNeely, ___ U.S. ___, 133 S. Ct. 1552, 1564 (2013) (describing "totality of the circumstances" tests as "fact-intensive").

- When the officer asked what was in the briefcase, the defendant asked if the officer had a warrant;

- The officer cut off any further inquiry by opening the briefcase and erroneously declared: "I can open the laptop."

¶64 The communications between the law enforcement officer and the defendant revealed that the briefcase was the defendant's, not the driver's. The totality of the circumstances demonstrates that the defendant signaled his ownership of the briefcase. Consequently, the validity of the driver's authority to consent to the search of the defendant's briefcase was questionable. The officer's reliance on the driver's authority over the briefcase was not objectively reasonable.

¶65 A law enforcement officer can assume that an officer has authority to perform a search only if "the facts available to the officer . . . warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises."[12] If a reasonable person would doubt that the consenting person had authority over the property, the officer must make further inquiry to determine whether the person has authority to consent to the search.[13] The officer "may not always take [a person's] consent to a search at face value, but

---

[12] Rodriguez, 497 U.S. at 188 (internal quotation marks and citation omitted).

[13] See Kieffer, 217 Wis. 2d at 548.

6

must consider the surrounding circumstances. That consideration often demands further inquiry."[14]

¶66 Professor LaFave explains that a contrary rule would undermine the purposes of the objective test of the totality of the circumstances to determine authority. It would, according to Professor LaFave, "make no sense whatsoever" to ignore facts discovered during a search to affect the authority of a consenter; doing so would "permit police simply to ignore all facts coming to light during the search that should cause a reasonable person to doubt the soundness of the previous conclusion that the consenting person has authority to allow the ongoing search."[15]

¶67 We have explicitly adopted this approach in State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998). In Kieffer, law enforcement officers obtained the consent of a homeowner who appeared to have shared authority over a lofted garage apartment. During their investigation, however, the officers learned facts that led them to doubt that the homeowner had authority to consent to a search of the lofted garage space.

¶68 The Kieffer court held that once a reasonable person would have reason to doubt the authority of the consenting party, the officers could not rely on the consenting party's

---

[14] Id. at 549.

[15] 4 LaFave, supra note 3, § 8.3(g), at 245.

7

apparent authority; the officers were obligated to ask additional clarifying questions.[16]

¶69 The majority opinion does not cite Kieffer. Instead, the majority opinion relies on United States v. Melgar, 227 F.3d 1038 (7th Cir. 2000), to support its assertion that law enforcement officers need not ask any clarifying questions when confronted with a non-consenting defendant claiming ownership or asking for a warrant.

¶70 Melgar is inapposite. Unlike the defendant in Melgar, the defendant in the instant case demonstrated his ownership of the property contemporaneously with the search and challenged the officer's search.

¶71 In Melgar, law enforcement officers had consent to search a hotel room from the renter of the room and all the occupants of the room. After all of the people had left the hotel room, the officers searched the room and found a purse in the bed, between the mattress and box spring. The purse had no personalized markings on the outside. The officers had no explicit permission from anyone to search the purse. They had no clue about who owned the purse.[17]

¶72 In Melgar, the police lacked "reliable information that the container [was] not under the authorizer's control."

---

[16] "[T]he surrounding circumstances could conceivably be such that a reasonable person would doubt [the] truth [of the consent] and not act upon it without further inquiry." Rodriguez, 497 U.S. at 188.

[17] United States v. Melgar, 227 F.3d 1038, 1039-40 (7th Cir. 2000).

Melgar, 227 F.3d at 1041 (cited by majority op., ¶46). The Seventh Circuit Court of Appeals reasoned in Melgar that "if the police do not have reliable information that the container is not under the authorizer's control," the police do not need to ascertain the identity of a container's owner prior to searching it.[18]

¶73 In the instant case, unlike in Melgar, the totality of the circumstances exposed reliable information that the briefcase was not under the consenting driver's (the authorizer's) control.

¶74 According to the majority opinion, however, "[o]nce valid consent for a search has been secured, law enforcement officers are not required to halt their search and question whether consent is still valid every time a person makes an ambiguous statement regarding the ownership of an item that is otherwise within the scope of that consent." Majority op., ¶47.

¶75 The majority opinion asserts that requiring inquiry into the scope of the consenter's authority "would place an onerous and unreasonable burden on law enforcement, particularly given that the true owner of the property may or may not be present." Majority op., ¶47.

¶76 That is not what our court stated in Kieffer. Indeed, requiring law enforcement officers to evaluate evolving circumstances is inherent in many search and seizure contexts.

¶77 As part of the objective analysis of a consenter's authority, courts regularly require law enforcement to evaluate

---

[18] Id. at 1041 (emphasis added).

9

and inquire into the consenter's authority in kaleidoscopic circumstances. For example, the court asks that officers determine whether a minor answering a door has authority under the circumstances to consent to a search of a house when the owner is not present;[19] whether a houseguest has authority under the circumstances to consent to a search of the contents of a computer without the owner being present;[20] and whether a landlord has authority under the circumstances to consent to a search of a tenant's bedroom.[21]

¶78 The totality of the circumstances in the present case should have indicated to an objective police officer that the driver did not have authority to consent to the search of the defendant's briefcase. Thus, the officer could not rely on the driver's consent to the search of the car or containers therein to be a valid consent to the search of the briefcase.

II

¶79 The majority opinion ignores the officer's erroneous assertion of authority that he could "open up the laptop," meaning he could open the briefcase including the laptop. Yet "one factor very likely to produce a finding of no consent . . . is an express or implied false claim by the police

---

[19] State v. Tomlinson, 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367.

[20] State v. Sobczak, 2013 WI 52, 347 Wis. 2d 724, 833 N.W.2d 59.

[21] State v. St. Germaine, 2007 WI App 214, 305 Wis. 2d 511, 740 N.W.2d 148.

that they can immediately proceed to make the search in any event."[22]

¶80 The officer, upon being confronted by the defendant's challenge, "Got a warrant for that?" falsely invoked the power of the law to justify opening of the briefcase. See Justice Prosser's dissent, ¶¶120-121.

¶81 By asserting his authority during the defendant's objection to the search, the officer made the driver's consent appear irrevocable. The officer cut off the defendant's opportunity to refuse to give his consent. "When a law enforcement officer claims authority to search . . . , he announces in effect that the occupant has no right to resist the search."[23] The officer undermined the principle that a person can refuse, revoke, withdraw, or limit consent.

¶82 The majority opinion ignores the officer's false claim of legal authority entirely and permits the law enforcement officer under false claim of legal authority to cut off any possibility of the defendant's objection to a search. This result cannot be correct when the law requires consent to be freely and voluntarily given to a warrantless search. State v. Artic, 2010 WI 83, ¶32, 327 Wis. 2d 392, 786 N.W.2d 430.

III

¶83 Because the totality of the circumstances is such that a reasonable officer was not entitled to believe that the driver

---

[22] 4 LaFave, supra note 3, § 8.2(a), at 71 (citations and footnotes omitted).

[23] Bumper v. North Carolina, 391 U.S. 543, 550 (1968).

11

had authority to consent to the search of the briefcase, the question of how consent is to be revoked, withdrawn, or limited need not be addressed.

¶84 I write on this issue, however, to make clear that I do not agree with the majority opinion's requirement that a defendant must make an "unequivocal" statement to revoke, withdraw, or limit consent.

¶85 As the majority opinion rightly notes, "[w]ithdrawal of consent need not be effectuated through particular 'magic words, . . . ."[24]

¶86 Nevertheless, the majority opinion adopts a rule similar to that used in determining an accused's invocation during interrogation of the right to an attorney or the right to remain silent. See Davis v. United States, 512 U.S. 452 (1994).

¶87 The Davis "unequivocal" or "unambiguous" rule has been heavily criticized on a number of grounds, including that the "unequivocal" test invites equivocation on the part of courts——identical statements may appear "unequivocal" to one court may be "equivocal" to another.[25]

---

[24] Majority op., ¶33 (quoting United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005)).

[25] Compare United States v. Martin, 664 F.3d 684 (7th Cir. 2011) (invocation was unequivocal when defendant said "I'd rather talk to an attorney first before I do that") with Delashmit v. State, 991 So. 2d 1215 (Miss. 2008) (invocation was equivocal when defendant said "I prefer a lawyer"). Compare also Wood v. Ercole, 644 F.3d 83 (2d Cir. 2011) (invocation was unequivocal when defendant said "I think I should get a lawyer") with Commonwealth v. Morganti, 917 N.E.2d 191 (Mass. 2009) (invocation was equivocal when defendant said he was "thinking I might need a lawyer and want to talk to him before talking to you").

12

¶88 As Justice Sotomayor noted in her dissent in Berghuis v. Thompkins, 560 U.S. 370, 408-12 (2010), the "unequivocal" or "unambiguous" test has limited practical value and erodes the protections that defendants receive under Miranda. The dissent explains that "ample evidence has accrued that criminal suspects often use equivocal or colloquial language in attempting to invoke their right to silence" and that courts imposing a clear-statement requirement "have rejected as ambiguous an array of statements whose meaning might otherwise be thought plain."[26]

¶89 I acknowledge that courts in other jurisdictions have adopted this "unequivocal" test in the context of revocation, withdrawal, or limitation of consent.[27] I am not persuaded that different tests should be applied to whether consent was granted and whether consent was revoked, withdrawn, or limited. I conclude that the same test should apply to both instances.

¶90 The "unequivocal" test results in an additional and unnecessary layer of complexity to an area of law requiring clarity.[28]

¶91 By using its flawed "unequivocal" test, the majority opinion bends a defendant's statement that a reasonable person would construe as an objection into mere equivocation and

---

[26] Thompkins, 560 U.S. at 410-11 (Sotomayor, J., dissenting).

[27] See, e.g., United States v. Stabile, 633 F.3d 219 (3d Cir. 2011); United States v. Sanders, 424 F.3d 768 (8th Cir. 2005); State v. Smith, 782 N.W.2d 913 (Neb. 2010); State v. Watson, 864 A.2d 1095 (N.H. 2004).

[28] State v. Williams, 2012 WI 59, ¶25, 341 Wis. 2d 191, 814 N.W.2d 460.

erroneously places the burden on the defendant to prove the unreasonableness of the search.

¶92 For the reasons set forth, I would reverse the decision of the court of appeals and hold that the circuit court erred in denying the defendant's motion to suppress.

¶93 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

14

¶94 DAVID T. PROSSER, J. *(dissenting)*. Several of the techniques employed by the law enforcement officer in this case are common in Wisconsin. The officer stopped a vehicle for minor traffic violations. He quickly learned that a passenger in the vehicle was a convicted felon with a history of drug abuse. With consummate skill, the officer embarked on a plan to elicit consent to search the vehicle so that he could determine whether it contained controlled substances. Most of the techniques the officer employed have been approved by this and other courts. The question presented here is whether the officer crossed the line of reasonableness by disregarding an apparent objection to a consent search and thereby violated the Fourth Amendment. I believe he did. Because the majority concludes otherwise, I respectfully dissent.

### FACTS SURROUNDING THE SEARCH

¶95 On August 26, 2010, a Sheboygan County deputy sheriff stopped a vehicle driven by Dennis Wantland (the driver) on Butler Street in Random Lake. The vehicle had a cracked windshield and a defective brake light. The officer asked the driver for his license. He also asked the passenger, the driver's brother, for his license. The officer then took the licenses and returned to his squad car, with its red and blue lights flashing, to run an identity check on the two men. Before he returned to the vehicle, the officer knew the driver had a minor record but that the passenger, Derik Wantland ("Wantland" or "the defendant"), was a repeat offender who had used drugs.

1

¶96 When he returned to the vehicle with a warning citation, the officer asked the driver to step out of the car and accompany him behind the vehicle to examine the defective "third brake lamp."

¶97 The officer later explained to the court that he made it a practice to ask a driver to leave his vehicle to show him "exactly what I'm talking about."

> Some people don't know what I mean by "third brake lamp," so I'll take them out of the vehicle, point out the brake lamp. And I've had the experience myself of trying to replace things, so I'll try to explain to them, you know, where you can get a light bulb, or how much, roughly, it would cost to get it fixed, and I kind of explain it to them, and then explain the written warning to them, tell them about the windshield, the safety of it, you know, that it's there to prevent anything from coming through the windshield, and if they would hit something that would hit the windshield, with it already being cracked, it's not as safe as it would be, you know, completely basically not broken, and kind of explain to them the reason for it.

¶98 The officer described his "conversational tone, trying to explain to [the driver] the reason for the stop and why he should get the things fixed." Then he went on:

> At that point, I asked if [the driver] had any questions, which I do on every traffic stop. If they have any questions, I'll be more than happy to answer them. He advised no, and I advised him he was free to leave, at which point I started walking back to my car, and he was walking back to the driver's door.[1]

(Emphasis added.)

---

[1] The officer advised the driver that he was free to leave. It is not clear whether the driver had someplace else to go. Wantland was on Butler Street in front of his house.

2

¶99 The officer walked toward the door of his squad car. Then, in a tactic reminiscent of Lieutenant Columbo, he suddenly turned around and asked the driver if there was anything in the vehicle that wasn't supposed to be there. When the driver answered no, the officer immediately asked him "if he would mind if I did a consent search of the vehicle." "The driver said 'yes, go ahead,'" the officer testified. On this point, the majority quotes the driver as saying: "Um, I don't see why not. We gotta get our tools and stuff out anyway." Majority op., ¶7.

¶100 In his police report, the officer wrote: "They asked if they could remove their items out of the rear of the vehicle and put them in the house at which point, I asked them to stand alongside the roadway and when I was done searching the car, they could remove their items."[2]

¶101 The officer obtained the driver's consent to search the vehicle, but the above-quoted passage from the police report reveals tension between the driver's consent and the brothers' expressed desire to remove their property from the vehicle.

¶102 Given the driver's consent to search, the officer asked Wantland to get out of the car and directed him to join his brother at the curb. For the next six and a half minutes,

---

[2] The following exchange took place at the suppression hearing:

DEFENSE ATTORNEY: And at one point, Derik Wantland actually asked if he could obtain his items out of the vehicle.

OFFICER: Yes, they'd asked if they could get their tools out of the vehicle. This was after the search had begun on the vehicle. And again I told them no.

the officer conducted a very thorough search of the interior of the vehicle using a flashlight and his hands. The officer opened both the driver's door and the passenger's door. He climbed into the vehicle from each side, opened the glove compartment, looked under the seats, checked the shelf near the back window, and ran his fingers through tight, concealed areas next to the seats. Finding nothing but some razor blades, which the driver explained were used in painting, the officer moved to the trunk area.

¶103 After searching the passenger compartment, the officer "opened the back hatch of the vehicle and observed a variety of tools and toolboxes, along with a briefcase." Majority op., ¶9. With his back to the squad car camera, the officer asked: "What's in the briefcase?"

¶104 For the first time, Derik Wantland spoke up: "A laptop. Uh. Got a warrant for that?"[3]

¶105 The officer replied, "I can open up the, uh, laptop," and he proceeded to remove the briefcase from the vehicle and

---

[3] The transcript of the suppression hearing reads in part as follows:

DEFENSE ATTORNEY: And as you were searching the back portion of the vehicle, you asked a question of, I guess, Derik Wantland and Dennis Wantland about what was in the briefcase; is that correct?

OFFICER: I may have asked what was inside the briefcase, yes.

DEFENSE ATTORNEY: And at that point, Derik Wantland asked you if you had a search warrant.

OFFICER: Yes, he did.

4

open it up. The sound track of the video records nervous laughter from Wantland who says, in response to the officer, "Yeah, it's uh, laptop, Visine, acid reflux."

¶106 According to the record, there were documents in the briefcase with Wantland's name. There was also a pair of scissors, a jackknife, coins, a bottle of Visine, and two opaque plastic pill bottles, at least one of which was for Benicar 40 mg.

¶107 The officer opened one of the plastic bottles and found two purple capsule-type pills that turned out to be morphine, a controlled substance. Later, at the Sheboygan County Jail, officers discovered two more pills in Wantland's pocket. These four pills constitute the evidence that the defendant sought to suppress.

DISCUSSION

¶108 The majority opinion takes the view that the driver of the car gave the officer consent to search the vehicle. Consent to search the vehicle included consent to search containers in the vehicle. The majority concludes that neither the driver nor the passenger ever effectively withdrew the driver's consent, and that the officer had no duty to ask any follow-up questions when Derik Wantland asked, "Got a warrant for that?" See majority op., ¶5

¶109 We are concerned here with application of the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

¶110 Article I, Section 11 of the Wisconsin Constitution is nearly identical, and historically, it has been interpreted to be consistent with United States Supreme Court interpretation of the Fourth Amendment. See State v. Dearborn, 2010 WI 84, ¶14, 327 Wis. 2d 252, 786 N.W.2d 97.

¶111 In Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971), the Supreme Court summarized the law on warrantless searches:

> [T]he most basic constitutional rule . . . is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment——subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."

Id. (second ellipsis and second brackets in original) (footnotes omitted). These passages have been repeatedly quoted or paraphrased in Wisconsin decisions.[4]

---

[4] State v. Sobczak, 2013 WI 52, ¶11, 347 Wis. 2d 724, 833 N.W.2d 59, cert. denied, 134 S. Ct. 626 (2013); State v. Artic, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430; State v. Pinkard, 2010 WI 81, ¶13, 327 Wis. 2d 346, 785 N.W.2d 592; State v. Faust, 2004 WI 99, ¶11, 274 Wis. 2d 183, 682 N.W.2d 371; State v. Williams, 2002 WI 94, ¶18, 255 Wis. 2d 1, 646 N.W.2d 834; State v. Matejka, 2001 WI 5, ¶17, 241 Wis. 2d 52, 621 N.W.2d 891; State v. Pallone, 2000 WI 77, ¶29, 236 Wis. 2d 162, 613 N.W.2d 568; State v. Phillips, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998).

¶112 One well-established exception to the warrant requirement is consent. State v. Phillips, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998); State v. Artic, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430; State v. Williams, 2002 WI 94, ¶18, 255 Wis. 2d 1, 646 N.W.2d 834; State v. Matejka, 2001 WI 5, ¶17, 241 Wis. 2d 52, 621 N.W.2d 891. Voluntary third-party consent is an established form of consent. Matejka, 241 Wis. 2d 52, ¶17.

¶113 The fact that "consent" is an established exception and that third-party consent can be acceptable does not mean that the consent exception does not present issues such as authority to give consent, scope of the consent, and the voluntariness of the consent.

¶114 There is no dispute here that the driver voluntarily consented to the officer's search of the vehicle. He was surely authorized to consent to the search of anything in the vehicle that he owned or lawfully controlled or shared with his brother. The question is whether his consent to search the vehicle not only covered a closed container within the vehicle, but also remained valid after his non-ownership of the closed container became clear by virtue of the fact that Wantland answered the officer's question with intimate knowledge of the contents of the briefcase and Wantland appeared to object to the search.

¶115 In Florida v. Jimeno, 500 U.S. 248, 249 (1991), the Supreme Court was asked to decide "whether a criminal suspect's Fourth Amendment right to be free from unreasonable searches is violated when, after he gives a police officer permission to

7

search his automobile, the officer opens a closed container found within the car that might reasonably hold the object of the search." The Court concluded that the Fourth Amendment was not violated: "The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open a particular container within the automobile." Id.

¶116 The facts in Jimeno are materially different from the facts in this case. First, in Jimeno, the defendant was the person who gave consent to search the vehicle. Id. at 249-50. Second, the arresting police officer told the defendant before he gave consent that the officer "had reason to believe that Jimeno was carrying narcotics in his car." Id. at 249. Third, the officer "explained that Jimeno did not have to consent to a search of the car." Id. Fourth, the officer saw and then opened a brown paper bag on the floor of the car and found a kilogram of cocaine inside. Id. at 250. Fifth, the defendant never said anything that limited or withdrew his consent.

¶117 Here, the defendant's brother, whose guard was down and who presumably had nothing in the vehicle to be concerned about, was the person who gave consent——not the defendant. The officer gave the defendant no warning about his search objective and no counsel that the defendant could refuse consent to a search of his property. The officer's search went into an opaque closed bottle in a closed briefcase in a closed trunk, and the defendant, after demonstrating ownership of the briefcase, asked the officer: "Got a warrant for that?"

8

¶118 Was it objectively reasonable for the officer to believe that the driver had given him consent to open up a pill bottle in his brother's briefcase? If so, was it still objectively reasonable for the officer to continue the search of the briefcase after Wantland asked his question?

¶119 The defendant's question may not have been perfect but it should have alerted the officer that the defendant was challenging a "consent" search of his briefcase. It would be difficult to articulate what other objective the defendant might have had when he asked about a warrant. The defendant had just witnessed the officer dig through the car like a police dog on assignment. He knew that his briefcase was the next target. "Got a warrant for that?" he asked.

¶120 The officer did not ask a follow-up question. Instead, his answer was an assertion of authority that shut down discussion. It effectively precluded dialogue. "I can open up the, uh, laptop" is not a responsive answer to the question.

¶121 The officer's "conversational tone" was now gone. His professed willingness to answer "any questions" had ended. His helpful hints on where to buy brake lights evolved into a series of orders. The officer was on a mission. If there were any doubt about the officer's new persona, it was put to rest when Derik Wantland walked to his house to go to the bathroom. The officer quickly pursued him, following him to the bathroom, ordering him not to flush the toilet, and threatening that if he did, the officer "could shut the water off and take the toilet

9

off and go into the trap and find anything that had been stuck in the trap."

¶122 This is a consent case. The officer had no probable cause or reasonable suspicion to conduct a search. The continuing validity of the consent to search must be assessed in light of the totality of the circumstances, which moved from the broad consent given by one brother to the pointed question posed by the other brother as the officer began to handle the property of the other brother.

¶123 I acknowledge that conscientious judges may assess these circumstances differently. In my view, the defendant withdrew any "consent" to search his briefcase, and the officer simply disregarded him. Because the majority's assessment is different from mine, I respectfully dissent.

¶124 I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.